All persons having business before this honorable court are admonished to draw near and give their attention, as this court is now sitting. God save the United States and this honorable court. Good morning, everyone. I see all counsel. So we can begin with our first case this morning, which is the United States against Harris, Walton and Gould. Mr. Hillis, I believe you're first. Good morning. Please, the court, counsel. My name is Daniel Hillis. I represent Yahtzee Harris. He raises a single issue on this appeal, and it's a simple one, whether the district court, since it orally pronounced a two year term of supervised release for count 11 should have gotten that sentence, should the written judgment therefore be amended, since it reflects a five year period of supervision that the judge did not pronounce. So I will begin with waiver, because that is, in the government's view, an obstacle. But that is not an obstacle here, because the government's view is basically informed by a Fifth Circuit case called Higgins, that's implicitly rejected by counsel, which is a Seventh Circuit case, and it states, the appeal waiver does not bar the defendant from appealing a sentence that is incorrectly reflected in the written judgment. So the oral pronouncement of the sentence is unambiguous in this case, and with the Albury and Johnson decisions by this court, that should be the sentence that is reflected in the written judgment, and when it's not, the judgment needs to be corrected. We think it's a simple. The waiver issue aside, don't we really have two pronouncements of the term of supervised release here? The judge orally ordered two years and then orally amended that and ordered five years of supervised release at the end of the hearing, based on the error with one of the counts. I don't think so, Judge. So the judge definitely referred to two years and five years, because there were different terms of supervision. So the two counts had different terms. And the judge, when he made the second statement, was just to reflect that one of the terms was a mandatory minimum term. And so he was being explicit about that, but in no way did he change the oral pronouncement for the two-year term that he stated previously. So it's not an ambiguity. It is something where the probation officer called that to his attention, and he said he hates long terms of supervised release, thinks they're counterproductive. And so it was a clarification about one term of supervision, not an amendment of the earlier orally pronounced two-year term, Judge. We think that's clear from the transfer. As far as the current sentencing doctrine, I'll rest on my brief, as well as other points, I'll rest on my brief. Unless the panel has questions, I will yield the balance of my time. All right. Thank you. Ms. Eisenman. Thank you, Judge. And may it please the Court, Vanessa Eisenman on behalf of Antonio Walton. With limited time, I'd really like to focus on Mr. Walton's trial. The district court here violated Mr. Walton's due process rights by failing to adjourn the trial in the wake of the COVID-19 outbreak. Again, the dates here are pretty important. On March 17, 2020, the district court found that it could not conduct a jury trial without, quote, substantial and unacceptable health risks, unquote, from COVID-19. But then it inexplicably only applied that finding to future trials and allowed Mr. Walton's trial to continue to closing arguments and deliberations. And again, as the government admits, there really was no question on March 17th at the very latest that COVID-19 was a huge distraction for everyone involved, including the jury, excuse me. I think very importantly or critically here, you have the court, after the verdict was rendered, you have the judge telling the jury, thanking the jury for its service under, quote, unquote, very difficult circumstances. That's this judge telling this jury that you had served under very difficult circumstances. That, combined with the rest of the record, just shows that this was a big deal. The court knew it was a big deal. The court knew the jury knew it was a big deal. And still, the court let this trial continue, not because it made any sort of due process findings, but because it just wanted to finish the trial. And that's in the record as well. The court told the jury, you know, we hope we didn't put you at risk. We don't think we did. And this is page 17 of our appendix. But really, we just didn't want to start all over again. And while I'm very sympathetic to the court's desire to be efficient, this was not the time to do it. The court had already committed to redoing the trial for one of the severed defendants. And even if that were not the case, you know, you've already made these findings that this is a huge deal. The jury's distracted. It's very difficult circumstances. And you just have to cut your loss when you're talking about due process and fair trial. Again, even under this standard, you know, we can see that there was not an objection on the record. But even under that heightened standard, the question is whether it was clear and obvious that a mistrial was necessary. And a mistrial is necessary when the jury can't decide the case based solely on the evidence before it. And again, the court is essentially admitting that the jury couldn't do that. Very difficult circumstances. Very difficult circumstances is not consistent with a fair trial and due process. And again, the court's reason for not suspending the trial was it just wanted to get this thing through the system. And that's just not enough when we're talking about constitutional rights. So unless the panel has any questions, I would reserve the remaining time for rebuttal. All right, thank you, Mr. Van Zandt. Good morning, may it please the court. James Van Zandt for Defendant Charles Gould. I'd like to start by pointing the court's attention to United States v. Polgar. This is a somewhat unusual case. Mr. Gould is appealing based on sufficiency of the evidence in a drug conspiracy case. However, as the court has previously noted, these are a little bit different than your standard sufficiency of the evidence case. In cases where the buyer-seller issue has been raised in a drug conspiracy, the court has said that in these special cases, we will also return a conviction when the plausibility of a mere buyer-seller arrangement is the same as the plausibility of a drug distribution conspiracy. That's very different than normal sufficiency of the evidence cases where the defendant faces a near-impossible burden, which is generally what happens in this sort of thing. So in this situation, what we're looking at is United States v. Johnson's factors. And how do we distinguish between a buyer-seller situation and a drug conspiracy situation? In this case, there's absolutely no evidence whatsoever as to two of the factors. There's no evidence of an agreement by Mr. Gould to look for other customers for the conspiracy. And there's no evidence whatsoever that Mr. Gould or Mr. Walton or anyone else advised the other of the conduct of the other's business. Now, the more interesting question is the question of sales versus consignment. Generally, the easiest way to distinguish a buyer-seller agreement versus conspiracy is whether or not the seller gets a cut of the profits of whatever's sold or places it on consignment. For instance, the seller leaves the drugs with someone, they sell it, they give it back, and they get a commission on it. What's interesting about this case is there was very clear evidence that all of the members of the conspiracy did work on consignment. Of the evidence that we have, individuals such as Mr. McLaurin, Mr. Crouch, they all received a set amount based on the number of counts they sold. Contrast that with Mr. Gould. There's absolutely no evidence whatsoever that Mr. Gould seemingly got a cut. One of the most important pieces of evidence that ever came out in this case was a text message between Mr. Walton and This is an issue that I raised quite a bit at trial and pointed heavily at the government at. If Mr. Gould's money was to be kept separate, unlike everyone else's, why? And the answer is he was not part of the conspiracy. He was, unlike the others, simply a buyer-seller. Mr. Van Zandt, can I ask you a factual question? Yes. I have a memory from your brief, I might be mistaken, you can correct me, that in your view, the trial evidence did not show that Mr. Gould sold from the so-called trap house. Is that correct? That's correct, Your Honor. Actually, what does the evidence show with respect to the location at which he sold? I have the same question for Mr. Holler, by the way. There's absolutely none, Your Honor. When I was going back to the trial transcript, this was something that actually jumped out at me, that both Mr. Crouch and Ms. Porter said that they'd never seen him sell drugs. No one ever said where he sold drugs. The officers who did surveillance in the area... But the evidence did show that he... Hold on, there's a comment in the courtroom, Judge Sykes. Judge Sykes, it looks like we lost Dan Hillis. Hold on one second. We'll see if he rejoins. All right, thank you. All right, Mr. Hillis is back. You may proceed, Mr. Van Zandt. I think you were answering Judge Scudder's question. Thank you, Your Honor. Going back to the question of where Mr. Gould sold, there's actually no evidence. The officers who were conducting surveillance on the area asked them explicitly at trial whether they'd ever seen Mr. Gould selling at the trap house, and they said no. One of the interesting points actually came out later, I think... But was there evidence that he, regardless of whether the location was unclear, that he, in fact, did sell and he sold a supply that came from the Walton organization? Oh, yes, Your Honor. There was no question whatsoever at trial that he sold drugs. That was not at issue in the trial whatsoever. Walton's drugs are drugs from Walton, correct? Yes, Your Honor. That's absolutely not at issue whatsoever. Okay. The defense's position is that what he was doing was buying the drugs from the Walton organization and going off and selling them. There was evidence from Mr., I believe it was Mr. Crouch, that there were also other individuals who acted like this, like on the last name, but by the nickname of E, also would go off and, quote, do his own thing, which is similar to what Mr. Gould did here. He would purchase and go off and sell. I see I've got 15 seconds left. If there are any additional questions, I'm happy to answer them. But what about his role as a courier between the Jeff House and Porter and Walton? There's conflicting evidence on that, Your Honor. Mr. Crouch specifically, excuse me, Ms. Porter said in various statements that Mr. Crouch was the one who would pick up the money and take it to Mr. Walton. We do know that Mr. Gould turned money into Ms. Porter, but so far as the drugs being couriered back and forth, the evidence is completely in conflict on that. Well, that means the jury could credit the courier role, if there was evidence on both sides of that, right? To an extent. If this was a normal drug conspiracy case, Your Honor, I would certainly agree. However, because we're talking about this buyer-seller versus drug conspiracy, the question is not whether or not there's any evidence. The question is whether or not it is equally plausible that Mr. Gould was a buyer-seller versus a member of the conspiracy. So in that respect, it is very different from the normal conspiracy case. All right. Thank you. Thank you, Your Honor. I think we're... Oh, Mr. Hook is back again. Okay. Obviously having a connection problem. All right. Mr. Holler, I think it's your turn. Thank you. Good morning, Your Honors, and may it please the Court. Each defendant's conviction and sentence should be affirmed. I guess I would just plan to proceed in the same order as the defendants did, unless the Court has some other preference. So beginning with Mr. Harris, I think the government wins, as we've explained, for three separate reasons. I do think the easiest way to win for the government to prevail in this case is to simply invoke the concurrent sentence doctrine. This Court has stated it will not review a sentence that is imposed fully concurrent to an unchallenged sentence, absent a substantial probability that the challenged sentence will in some way harm the defendant. Here, the defendant is not challenging his five-year term of supervised release on count one. His only argument is that his five-year supervised release term on count 11 should in fact be a two-year term. Mr. Harris will, when released, be serving five years, whether that is on one term or two terms regardless. And so consequently, he has to show some substantial probability that this will actually harm him. This can't be a highly speculative consequence, these courts have said, and it can't be one that is entirely within his control to prevent. And it is both of those. In order for this to have any harm or any impact on him, first, he would have to not violate during the first two years of his supervised release. Second, despite the fact that he doesn't violate first two years of his supervised release, the district court would have to go back on its own statement saying, hey, I'm planning if you behave during those first years to cut you. So the district court would have to not terminate the term of supervised release less than two years in. Third, the defendant would have to violate, and again, this is entirely within his control as to whether or not he violates his supervised release. But he would have to violate between years two and year five rather than behave the entire time period. And finally, the court would have to decide that the violation that he committed was so severe that it wanted to impose a term of supervised release greater than five years. Because with simply the five-year term on count one, the court is free to impose that term. That is highly speculative. The Fourth and the Eighth Circuits observed that it is.  we believe that the court need not reach the issue. On the appeal waiver issue, again, you know, I think that the court's decision in Tansel is unpublished. It's a single paragraph and it's not reasoned. The court certainly could adopt that and could explain it further, but it's not required to because it's an unpublished decision. And we believe that the Higgins Court, the Fifth Circuit did explain, you're challenging the sentence here. He's challenging his sentence that he's, that the district court gave him on this count. And that is a challenge that the oral and written judgments conflict. And so we believe the court, if it needs to reach the appeal waiver issue, should find in the government's favor on that. This is a challenge to the sentence and the appeal should be dismissed on that basis. Mr. Holler, can I pause you on that point? Sure. So suppose you had a situation where sentence is announced in court, written judgment is entered, and the written judgment includes a whole range of additional supervised release conditions that were never, you know, discussed in the courtroom. Nothing was waived, et cetera, that way. The appellate waiver cover that in your view? He'd say, I waived any challenge to his sentence. Well, I think that it would, Your Honor. I mean, first of all, I think if there was some clear mistake that something had been appended to the judgment that wasn't supposed to be, that would probably be a Rule 36 error. What if a judge said, on further reflection, I'm going to impose a 15-year sentence, not a 10-year sentence, that I announced in the courtroom. I'm going to record the 15 years in the written judgment. I think that that would be a violation. Well, first of all, I think that would be a violation of Rule 36. They wouldn't be able to correct an error like that. Right, but he's waived everything in the government's view. I'm sorry? But he's waived everything. He's waived an ability to challenge a sentence. The difficulty that I have with the Fifth Circuit's position is, what's the limiting principle of it? I mean, you could come up with as many hypotheticals as I can. What limits it? I mean, I guess we're having to assume that there's a district court judge out there who's in your last example. That might be something that would rise to the level, I suppose, of mandamus. But if we assume that district court judges are behaving as they always have and as we always expect them to, I think that, first of all, defendants don't have to enter into these agreements. If they really are concerned about that, they could say, I'm just not going to enter into a plea agreement with an appeal waiver. But I think that that's the whole point of an appeal waiver is it cuts out potentially meritorious appeals. Regardless, I think for the reasons sort of that Chief Judge Sykes expressed, we don't think that this appeal is meritorious. We think that it is ambiguous as to exactly what's being corrected here. OK, the term can't be two. It's got to be five. So the guidelines basically suggest, hey, for ease and administrative purposes, if it's five on one, it's five on another. It's five on everything. Well, the court doesn't have to do that. And maybe if this was brought to the attention of the court at the time, the court could have said, oh, well, I only have to make it on five on this. I'm going to make it two on this. The court didn't. So there's an ambiguity. I hear you on that. I just wanted to get the benefit of your reaction to the appellate waiver point. Sure. So which, again, I mean, the court can, we believe, resolve this on all of those three grounds. If the court has the most concern on the appellate waiver ground, then it can set that issue to the side and resolve it on one of the other two issues. But that is our position is, you know, these defendants choose to enter into these appeal waivers. They absolutely don't have to. We have many defendants who say they don't want the risk and who choose to plead in the blind or plead without appeal waivers. So, I mean, that's their choice. Moving on to Mr. Walton's case, Your Honor, you know, March 17th is kind of right at the beginning of the pandemic. And lots of different courts made different judgments around that time. This was the judgment that this particular court made. I don't, there's nothing that in the district court's decision here that violated the Northern District of Indiana's order, nor do I necessarily believe that would be correctable by this court anyway. At the same time, the Northern District's order explicitly left open the continuation of jury trials. At the time that the order was entered, everybody who needed to be present for the court on March 17th was already there. There weren't any witnesses that were going to come in. Closing arguments, I believe, had already started. And so the court, I guess, had to decide is if we're all already assembled here, you know, maybe something terrible is going to happen to us. But it's not going to get any worse. We've already been around each other. We've already been exposed to each other. And that's a rational thing for the district court to decide. Even if sitting here with hindsight, we might think differently, or even if different judges at that time might have thought differently, this is a reasonable response to a difficult situation. And that's what McClintock says is the standard. Did the district court respond reasonably to a difficult situation? Here, the court did that. And doesn't the, Mr. Hall, doesn't the jury's split verdict in this case indicate that it took its role seriously? It didn't cut corners. It considered the evidence in the law as instructed and gave due consideration to all of the arguments that were raised. So we don't have a fair trial violation here. There's no due process violation here. And again, look, if anybody in the courtroom had said, I don't want to be here, I feel really unsafe, I think the judge would have taken that seriously. The judge would have been required to take it seriously. And the judge would have been required to enter findings. Nobody said that. And if the defendants had been acquitted, they could have walked out of the courtroom that day. Instead of being detained. So, you know, on the eve of the COVID-19 pandemic, I don't think anybody wanted to be in jail. There are reasons why the defense would want this case to go forward, considering where it already was in the process. Yeah, the standard is could the jury decide based on the evidence before it? I mean, in for a dire all the time, jurors may say, hey, I have something going on in my personal life, or I have some concerns. And the standard isn't, oh, there's something going on that's potentially going to distract you. The question is, can you put that aside and decide this case based on the evidence before you? And clearly the jury did that here. And as you pointed out, Chief Judge Sykes, the jury didn't walk into the jury room and immediately walk out the door. They deliberated for over six hours. They reached a thoughtful verdict. They acquitted one defendant. They acquitted these defendants of involvement in powder cocaine, which there was much less evidence on. And so there was no abuse of discretion here. Turning to Mr. Gold's claim, Your Honor, this case is night and day from Pulgar. Pulgar is, you know, a customer, right? I mean, a customer of a drug dealer, they get called up, they go and meet and they sell drugs for cash. This is a, you know, I mean, it's the difference between I go to Walmart or go to one of the Walmarts near me to buy things and a Walmart employee who runs the cash register and works the floor and drives money to the bank. You know, the Walmart employee is part of a conspiracy with the other Walmart employees to sell me stuff, even though I'm not in a conspiracy with any of them. I'm just a buyer of what they're selling. As far as Judge Scudder, the question of the evidence, I mean, this is a jury question, right? Ms. Porter testified that on page 743, all of the defendants sold inside. Kitchen sold inside, nephew sold inside, and Mooney, which is Gould's name, sold inside. They sold inside the house. Now, Mr. Van Sant, to be sure, came on across his emanation and said, well, were you in the trap house? Did you actually see these sales? No, but did she, did he, like all of the others in this conspiracy, come to the window next door, get crack from her, go inside the house, and come back with money? Yes, that's what happened here. So, you know, I mean, the jury, if they wanted to, could say, oh, maybe he went in the house, and then he went and sold this somewhere else. But absolutely, the jury could infer to the contrary. And as you pointed out, Judge Sykes, he was also a courier. Ms. Porter testified that he was a courier several times at trial. And again, on cross-examination, yes, in her previous interview, the first time she was arrested, she only mentioned one other person as the courier, and she didn't mention Gould as the courier. So if the jury wanted to, they could say, hey, we don't believe you. But if they believed her testimony, that he, in fact, is couriering drugs and money back and forth between Walton and Porter, and Walton in the trap house, then they could easily believe that he's on the same side of the transaction that Walton, Porter, Gould, Kitchin, Nephew, Caldwell, all these other people are on. Counsel, what about the gun? What was the connection that the government proved tying the gun to Mr. Gould's participation in a larger conspiracy as opposed to just keeping the gun at Porter's house? That was the mother of his child. They obviously had a relationship. He must have been at the house quite a bit. He could have kept it there for safekeeping. What's the evidence that this gun was related to the conspiracy? Well, the evidence, and this is on page 740, the evidence was that the gun was kept in a box in the closet next to a drug scale and money. So it was, and that Gould gave her the gun. So it is tied to the room in the specific location where all of the drugs are being dealt. Again, that's just one piece of the evidence. In addition to his role as a courier, in addition to him texting Porter and letting her know when police are in the area, asking to have walkie-talkies chained, charged. So all of that is part of the evidence together that allowed the jury to find beyond a reasonable doubt that he's not just a drug buyer. He's an intimate part of this conspiracy with the rest of the Walnut family. If the court has any questions about any of those points, I'm happy to answer them. But otherwise, and we also believe, although this wasn't raised directly in oral argument, that Walton's sentence, this court has never found a within range sentence to be substantively unreasonable. And there's nothing unreasonable about the lengthy sentence here for the leader of the drug conspiracy. So if the court has no further questions, we would simply ask that Gould and Walton's convictions be affirmed and that Walton and Harris's sentences be affirmed. All right. Thank you very much. Mr. Hillis. Sorry for the technical difficulties. As for the waiver, I hope that is off the table, that the Fifth Circuit reasoning is incorrect. Judge Scudder's highlighting some of the problems. We are not a nation so much of trials, but rather we actively, as prosecutors, entice people to sign plea agreements. They should at least as defendants get the benefit of their bargain. My client would only like to get the sentence of the judge unambiguously pronounced. The clarification that was done during the sentencing hearing shows the judge was made aware that one count had a mandatory minimum, not two. And so he finessed the oral pronouncement to make that clear. There remains then a two-year supervised release term on the count that is challenged where the written judgment gives five. We are not asking the court to engage in speculation about future violations. These are real possibilities. Therefore, they are real things to address on the appeal. And as for concurrent sentencing doctrine the government raised in its brief and may be alluded to here, we are not at risk in a concurrent sentencing situation where a person cannot serve more time by virtue of one longer sentence swallowing up a smaller one. When it's supervised release, additional punishment is now on the table in a way that it's not under the concurrent sentencing doctrine that the government realized. So therefore, the government's reliance on that doctrine, the inapplicable habeas cases, et cetera, don't save it in this case. There's a simple avenue. We don't need to reinvent the law. We simply need to apply it the way that it is supposed to be. Thank you. Thank you. Ms. Eisenman. Thank you, Chief Judge Sykes. I would like to go to your question to the government first, you know, regarding the jury split verdict. I really don't think that goes quite as far as the government contends it does. And there are a couple of reasons why. First of all, this is not a harmless error analysis. We're talking about due process, fair trial. The question, even without an objection, is whether it was clear and obvious that the jury was able to decide the case based solely on the evidence before it. Also, I wanted to note that the defendant that was acquitted was Talisha French, and there was really no evidence at all against her at trial. She was not even close to Mr. Walton and Mr. Gould. So I don't really think that gets you all that far. I think the evidence was that Mr. Walton drove and sat in his car in her driveway to kind of oversee the drug operations. And that was about it, other than her being a member of the family. I also want to, you know, rebut the government's contentions that, you know, all these, everybody was all together for a week and nothing else was going to happen. And the court made this reasonable analysis. No, it didn't. That's not in the record. The record is that there was unacceptable and substantial health risks from COVID-19. And the court did not continue or decided to continue this trial because it wanted to get it over with. That's what's in the record. There's nothing in the record about a court analyzing what precautions were being taken, because there were none, except for a couple of screening questions at the court. There's nothing in the record about the court asking the jurors if they felt comfortable, like you wouldn't have WADAR. There's nothing about that. The court tells the jury after it returned its verdict that we didn't want to start over again. That's the court's reason for doing this. And again, Ms. Eisenman, two questions here. You agree we're on plain error review on this question, right? Yes, I think it's something, you know, akin to that. I think the government articulated the standard as it needs to be clear and obvious that a mistrial was necessary. And I didn't really find anything to dispute that. Well, I guess I'm asking, do you concede that the defendants forfeited the argument? I concede that there was no objection. Yes, I absolutely do that. And I'm not trying to get into any ineffective assistance issues here on direct appeal. I'm saying even without the objection, it was clear and obvious based on this court's orders and this court's findings and this court's statements that it should have declared a mistrial. My second question is if the court had declared a mistrial, the defendants who were detained would have remained in pretrial detention? Is that so? Yes, I believe that's correct. Okay. I see my time is up. Thank you. I would ask that the conviction be vacated and the case be remanded for new trial. Thank you. Thank you. Mr. Van Zandt. Yes, Your Honor. One brief factual clarification I want to make sure is addressed. There was mention of Mr. Gould being the father of Ms. Porter's child. That's not correct. This is on page 936 of the transcript. At the very end of Ms. Porter's cross-examination. When this whole thing came up, Porter Exhibit 4 and Porter Exhibit 5, I showed those to her and these are photographs of an individual named Jaquan Perry, who was not otherwise discussed in the case. Mr. Perry is the father of Ms. Porter's child, not Mr. Gould. This was particularly important with the whole baby-daddy discussion. So that's why that came up. But I just wanted to make sure that was clear in the record. If there's any other questions, I'm happy to answer them, Your Honor. All right. Any other questions? Judge Jackson, Acuity? Judge Scudder? Not for me. All right. Thank you very much. Thank all counsel for arguments in this case and we'll take the case under advisement.